940 So.2d 593 (2006)
The SCHOOL BOARD OF MIAMI-DADE COUNTY, the School Board of Palm Beach County, the School Board of Broward County, the School Board of Volusia County, the School Board of Monroe County, Marilyn Spiegel, Taxpayer, and the Citizens' Coalition for Public Schools, Appellants,
v.
James E. KING, Jr., in his official capacity as President of the Florida Senate, Johnnie B. Byrd, Jr., in his official capacity as Speaker of the Florida House of Representatives, Jim Horne in his official capacity as Commissioner of the Florida Department of Education, the Florida Department Of Education, the State Board of Education, the School Board of Brevard County, the School Board of Clay County, the School Board Of Duval County, the School Board of Hillsborough County, the School Board of Leon County, the School Board of Liberty County, the School Board of Polk County, and the School Board of Seminole County, Appellees.
Nos. 1D05-4521, 1D05-4524, 1D05-4526.
District Court of Appeal of Florida, First District.
October 31, 2006.
*594 Rodolfo Sorondo, Jr., Lenore C. Smith, and Jack L. McLean, Jr., of Holland & Knight LLP, Miami, Counsel for the School Board of Palm Beach County and the School Board of Broward County; Theodore R. Doran, Michael Ciocchetti, Audrie M. Harris, and Aaron R. Wolfe of Doran, Wolfe, Rost, Ansay & Kundid, Daytona Beach, Counsel for the School Board of Volusia County and the School Board of Monroe County; and Fred H. Flowers of Flowers & White, Tallahassee, Counsel for Marilyn Spiegel and the Citizens' Coalition for Public Schools.
William C. Gentry of the Law Office of W.C. Gentry, P.A., Jacksonville, Counsel for James E. King, Jr., as President of the Florida Senate; Chesterfield Smith, Jr., and Jason Vail of the Office of the Attorney General, Tallahassee, Counsel for the Department of Education and the State Board of Education; and Sylvia H. Walbolt, Daniel C. Brown, and Christine R. Davis of Carlton Fields, P.A., Tallahassee, Counsel for the Florida Senate and the Florida House of Representatives.
BARFIELD, J.
The appellant school boards unsuccessfully challenged the 2004-2005 General Appropriations Act, chapter 2004-268, Laws of Florida. Because of a change in the method used to calculate the Florida Price Level Index (FPLI), appellants received a smaller increase in their K-12 public school funding than they would have received *595 if the previous method of calculating the FPLI had been used.
The Florida Education Finance Program (FEFP) was created by the Florida Legislature in 1973 to provide a base level of educational resources for public school districts, primarily by redistributing funds from counties with a higher tax base per student to counties with a lower tax base per student. The FEFP funding formula starts with an estimate of the base "per-student" funding, then makes several adjustments, including one for special needs students and one for the cost of hiring both instructional and non-instructional school personnel. The District Cost Differential (DCD) used for the personnel cost adjustment is intended to account for the variation among the counties in the cost of wages and salaries for school personnel, which accounts for approximately 80% of the school district operating costs. The DCD calculation, which depends upon the FPLI, is set out in section 1011.62(2), Florida Statutes:
1011.62 Funds for operation of schools.If the annual allocation from the Florida Education Finance Program to each district for operation of schools is not determined in the annual appropriations act, it shall be determined as follows:
. . .
(2) DETERMINATION OF DISTRICT COST DIFFERENTIALS.The Commissioner of Education shall annually compute for each district the current year's district cost differential. The district cost differential shall be calculated by adding each district's price level index as published in the Florida Price Level Index for the most recent 3 years and dividing the resulting sum by 3. The result for each district shall be multiplied by 0.008 and to the resulting product shall be added 0.200; the sum thus obtained shall be the cost differential for that district for that year.
Before enactment of the above-quoted statute, the Florida Legislature had assigned the DCD multipliers to the counties in the general appropriations act for each year.
Since its creation in 1973, the FPLI has been a measurement of the retail cost of a specific "market basket" (including housing, transportation, health care, food, and other goods and services) in different places at a particular point in time, similar to the Consumer Price Index calculated by the U.S. Bureau of Labor Statistics. The "market basket" approach is an indirect measure of wage levels, and was initially used because there were no adequate databases from which to directly index Florida school district personnel wage levels. The authors of the original FPLI noted that it was experimental.
Since 1995, at the request of the Florida Legislature, the University of Florida Bureau of Economic and Business Research (Bureau) has annually reviewed the FPLI and made recommendations to improve it. Since 2000, the Bureau has been responsible for calculating the FPLI under the direction of the Department of Education (DOE) and the legislature. While the Bureau has made a series of methodological improvements to the FPLI (standardizing the items included in the market basket, selecting items so as to maximize the ability of the index to measure variation in prices, and changing the way the items are weighted), the FPLI has remained a measurement of the price of goods and services.
In specific appropriation 113 of the 2003-2004 General Appropriations Act, chapter 2003-397, Laws of Florida, the legislature directed DOE to commission a study by the Bureau to consider the accuracy and appropriateness of several aspects of the FEFP funding formula, including *596 the "current price level index methodology and the development of alternative approaches including, but not limited to, a wage index."
The Bureau's study, based on research done principally by economists James F. Dewey and David Denslow, found that the FPLI "as it stands is a very good measure of variation in the costs of goods and services across counties" but that "the current version of the FPLI suffers a serious problem when used as the basis of a personnel cost adjustmentit ignores the role of amenities." The study explained that amenities were important in determining the personnel cost adjustment because "if a location is more desirable as a place to live, `compensating differentials' will develop in housing and labor markets," i.e., housing prices will be driven up, "while in the labor market, people will be willing to work for less, since the desirability of the location itself provides compensation."
The Bureau's study stated that the "market basket" price index had been used for 30 years because of the impracticability during that period of constructing a wage index based on the wages paid by other employers to measure the effect of amenities on personnel costs, but that more recently, reliable data had been compiled "on wages for a wide variety of finely classified occupations for all 67 Florida counties" from which a wage-based index, which would directly measure and estimate the differences among the districts in the cost of hiring personnel, could be developed. It stated that the Bureau had developed from this data "an amenity-adjusted, statistically- and geographically-smoothed version of the FPLI, denoted FPLI_AS" and explained that "FPLI_AS exhibits far less spatial variation than does the current version of the FPLI, and its level of variation is less likely to trend up significantly over time."
The Bureau's 2003 FPLI report summarized the study and presented four alternative indices: the Pecuniary Consumption FPLI (FPLI_P), a market-basket index similar to that which had been used in the past, and three versions of the amenity-adjusted wage-based index developed by the Bureau.[1] The "low centrality" wage-based index was based upon analysis of data regarding geographically decentralized occupations within the respective counties; the "high centrality" wage-based index was based upon analysis of data regarding geographically centralized occupations within the respective counties; and the "average centrality" wage-based index was based upon averaging the two wage indexes.
The Bureau's report recommended using the statistically- and geographically-smoothed "low centrality wage-based index" (FPLI_AS) as the basis for the DCD, which would mean that "the typical student would find [his/her] base funding changed by 2.75%, up or down" as compared to funding based on the traditional FPLI_P. It noted that the largest increases in funding using the FPLI_AS (up to 5.4%) would occur in Leon, Duval, Gadsden, and Nassau counties, while the largest decreases (up to 7.6%) would occur in Monroe, Miami-Dade, and Broward counties.
*597 In March 2004, DOE published the 2003 FPLI report with the four alternative proposed indexes and the Bureau's recommendations. Thereafter, committees from both houses of the legislature extensively questioned the Bureau economists about their recommendations. The Conference Committee Report on HB 1835 which was adopted on April 30, 2004, by both houses of the legislature did not specify the method used to calculate the FPLI, but it included $22.6 million in "District Cost Differential (DCD) transition supplement" appropriations allocated among several school districts, including appellants.
Specific appropriation 81 of the 2004-2005 General Appropriations Act, chapter 2004-268, Laws of Florida, provided that a "minimum guaranteed level of funding shall be calculated to provide each school district a 1.0 percent increase per unweighted full-time equivalent K-12 student over the amount per unweighted full-time equivalent K-12 student funded in the 2003-2004 FEFP" and that the DCD "for each district shall be calculated pursuant to the provisions of section 1011.62(2), Florida Statutes." While the Act did not specify the method used to calculate the FPLI which is referenced in section 1011.62(2), it did include the above-noted "DCD transitional supplement allocations," indicating that the Bureau's FPLI recommendations had been accepted.[2]
In June 2004, the School Board of Miami-Dade County brought an action for declaratory judgment, naming as the defendants DOE, the State Board of Education, and the Florida Legislature. Various parties were allowed to intervene in the suit as plaintiffs and as defendants, including school boards which were favorably and unfavorably affected by the change in the method of calculating the FPLI.
Count I of the complaint sought a declaration that neither DOE nor the legislature had the authority under section 1011.62(2) "to select and/or designate among the four price level indices assigned to Plaintiff in the Bureau's publication of the 2003 FPLI" and that "without a single price level index for Plaintiff being published in the 2003 FPLI, the selection and/or use by the Department of any of the price level indices in the 2003 FPLI is invalid."
Count II of the complaint sought a declaration that any attempt "to implement an amenities-based price level index to calculate the DCD funding," or "to authorize the selection of a price level index from the four indices published on February 29, 2004," or "to authorize or implement an amenities-based price level index to calculate the DCD" would be unconstitutional as a violation of Article III, section 12, of the Florida Constitution, which limits the scope of appropriations bills.[3] The complaint asserted that the legislature "may not enact substantive law that would allow the Legislature or Defendants to choose from one of four published price level indices in determining the 2004-2005 DCD."
Count III of the complaint sought a declaration that "the calculation of the *598 2004-2005 DCD for Plaintiff using the low centrality amenities-based index" violates Article IX, section 1, of the Florida Constitution[4] because it "results in the arbitrary, capricious, non-uniform and discriminatory distribution of education funds" and also because it "den[ies] thousands of public school students in the Plaintiff school district the uniform, safe and high quality education to which they are guaranteed."
Count IV of the complaint sought an injunction preventing the defendants "from using any amenities-based index to calculate the 2004-2005 DCD." The complaint asserted that the plaintiffs were likely to succeed on the merits of its claims, that they would be irreparably harmed by the loss of funds resulting from use of the amenities-based index, and that they did not have an adequate remedy at law because "there is no practical way to recover any funds improperly disbursed." After an emergency hearing, the trial judge denied the request for temporary injunction, finding that the plaintiffs had not demonstrated irreparable harm.
The defendants' motion to dismiss the complaint asserted that it had improperly sought to involve the courts in a "political question" and that it had improperly sought an advisory opinion. It asserted that the 2004-2005 General Appropriations Act had not changed substantive law; that the Act had not violated Article III, section 12, of the state constitution; and that the Act had not violated Article IX, section 1, of the state constitution, which it asserted does not provide a private cause of action for its enforcement. It asserted that each of the counts of the complaint had failed to state a cause of action; that the plaintiffs had failed to join indispensable parties; and that the plaintiffs lacked standing.
The trial judge denied the motion to dismiss the complaint on the grounds of lack of standing and failure to join indispensable parties, and denied the motion to dismiss counts I and II for failure to state a cause of action, but granted the motion to dismiss count III, finding that "no private cause of action exists under Article IX, section 1 of the Florida Constitution for the enforcement of its provisions" and citing Simon v. Celebration Co., 883 So.2d 826 (Fla. 5th DCA 2004), as "controlling." The judge denied the plaintiffs' motions for rehearing, but granted a motion to amend count III to "allege an action for declaratory judgment as to whether the Florida Price Level Index used by Defendants for the District Cost Differential component of the 2004-2005 Florida Education Finance Program violates the uniformity requirement of Article IX, Section 1 of the Florida Constitution." The subsequent motion to dismiss count III of the amended complaint asserted that it had failed to allege ultimate facts demonstrating a violation of the uniformity provision and that the plaintiffs were "simply attempting to state an `adequacy' claim under Article IX, Section 1 and disguising it as a `uniformity' claim."
The defendants' motion for summary judgment argued with respect to count II that Article III, section 12, of the Florida *599 Constitution applies only to general appropriation acts and prohibits only the amendment of substantive law unrelated to appropriations by means of the appropriations act, citing Division of Administrative Hearings v. School Board of Collier County, 634 So.2d 1127 (Fla. 1st DCA 1994), and that the 2004-2005 General Appropriations Act did not amend section 1011.62(2). The plaintiffs' response argued that summary judgment was improper "because genuine issues of fact exist regarding whether Defendants' use of a new wage-based index to allocate education funds violates Article III, section 12 of the Florida Constitution because it reflects an attempt to use appropriations legislation to alter the DCD component of the FEFP formula specified by substantive law."
In granting the motion for summary judgment with respect to count II, the trial judge ruled that there were no disputed issues of material fact, that count II presented "a pure, legal issue," and that no evidence had been presented "to support the contention that Article III, Section 12 of the Florida Constitution has been implicated by the actions of the Florida Legislature in the promulgation and passage of the 2004 Appropriations Act." He found that the formulation of the challenged methodology by the economists, the acceptance of it by the legislature, and the utilization of it by DOE for computational purposes "predated the construction of the 2004 Appropriations Bills and the passage of the Appropriations Act."
After the plaintiffs had presented their evidence at trial, the trial judge granted the defendants' motion for involuntary dismissal of the remaining counts of the complaint under Florida Rule of Civil Procedure 1.420(b). In the final judgment, the judge observed that counts I and III had "appeared to primarily present questions of law," but that, "perceiving there might be some mixed issues of law and fact, the Court afforded the parties extensive discovery and held a final evidentiary proceeding."
The judge explained that the motion for involuntary dismissal was granted as to count I because the evidence presented by the plaintiffs, taken in the light most favorable to them, did not demonstrate a right to declaratory relief. He rejected the plaintiffs' premise that section 1011.62(2) "established a specific methodology from which neither DOE [n]or the Legislature may vary," and he also rejected the plaintiffs' premise that FPLI can mean only a consumer price index or "market basket" index. He ruled that he could not find "that it was clearly erroneous for defendants to use a wage component or an amenities component in the calculation of the 2003 FPLI, nor did they act unlawfully or in contravention of the Florida Constitution in doing so." He found that the choice of index "constitutes a matter of interpretation of a statute by those charged with its implementation and is entitled to great weight," that the plaintiffs had "failed to show that any of the defendants acted unreasonably, much less unlawfully or in violation of their constitutional prerogatives, in using the 2003 FPLI_A, low centrality price level index," and that it was not within the province of the court "to substitute its judgment for that of the legislative and executive branches of government."
The judge explained that the motion for involuntary dismissal was granted as to count III because, viewing the evidence most favorably to the plaintiffs, it was "wholly insufficient to establish a uniformity claim under the Florida Constitution," which he found requires a showing that the plaintiff school district "is being under-funded to the extent it cannot provide the *600 necessary basic core education while other school districts are not similarly disadvantaged." He noted the plaintiffs' evidence "to the effect that the change in the FPLI resulted in less money to their school districts and that it could impact on their ability to hire teachers," but he observed that the witnesses had acknowledged that every school district needs more money and has to make difficult decisions in prioritizing the use of funding. He found that the plaintiffs had "failed to offer any evidence to establish that any of the plaintiff school districts have been so severely disadvantaged by the funding formula at issue that basic education needs are not being funded." He noted that he "would ordinarily expect that expert testimony would have to be relied upon to establish a uniformity claim in order to demonstrate the significant disparity between school districts sufficient to rise to the level of a constitutional violation," but that Dr. Ashenfelter, plaintiffs' sole expert, "did not even address this issue."
The plaintiffs/appellants have raised numerous issues, challenging these rulings and other procedural rulings. We affirm each of the challenged rulings without further comment, with the exception of the dismissal of count III of the original complaint, which we affirm, but which we find requires some further discussion.
The motion to dismiss count III of the original complaint argued, inter alia, that the legislature had established the statutory guidelines and had delegated the allocation of educational funds to DOE, a procedure which is "not only constitutional, but essential to carrying out the functions of government and accommodating changes in circumstances and, in this instance, the ability to collect and better assess data." It asserted that Article IX, section 1, requires the state "to make provision for a statewide system and to regularly reassess the statewide system to assure a uniform and fair allocation of dollars to support a quality system of schools in all districts" (emphasis in the original). It argued that section 1011.62(2) contemplates that the DCD "will be annually recalculated," that "no fixed methodology is established or required," and that the fact that the FPLI "is constantly reevaluated and updated to accomplish the purpose of the [DCD] is consistent with Constitutional requirementsnot the other way around as Miami-Dade argues in its quest for some vested right to an outdated, inadequate methodology that would work to its advantage." It asserted that the plaintiffs "seek to have the Court exercise legislative and quasi-legislative power and resolve a political question." It argued that count III of the original complaint was legally insufficient to show any violation of the state's duty under Article IX, section 1, asserting that the clause "requires only a uniform and adequate system; it does not govern the underlying decision-making process, and does not provide a constitutional bulwark concerning `discrimination' separate from the uniformity required of the system." It pointed out that there was no allegation that the defendants "applied the complained-of price level index and the resultant DCD disuniformly [sic] among the school districts" and argued that the complaint "does not state a justiciable claim of an unsafe or non-high quality `system' under Article IX, Section 1, merely by alleging that one method of determining the DCD gives Dade County fewer state-generated dollars than another method of determining the DCD." Finally, it asserted that "there is no clear definition, statutory or otherwise, regarding the meaning of `adequate provision for the education' or `a uniform system of free public education' as it relates to Article IX, Section 1," and that the clause "cannot be considered self-executing because the language does not *601 address the potentially numerous issues that may arise under this provision," noting that in Simon v. Celebration Co., the 5th DCA "recently held that no private cause of action exists under Article IX, Section 1 of the Florida Constitution."
In the order granting the motion to dismiss count III, the trial judge ruled that Simon, "holding that no private cause of action exists under Article IX, section 1 of the Florida Constitution for the enforcement of its provisions, controls the claim asserted in Count III of the Complaint and binds this Court." We find that Simon does not hold that no private cause of action exists under Article IX, section 1, of the Florida Constitution for the enforcement of its provisions, but that count III of the original complaint was nevertheless properly dismissed because it did not state a cause of action under applicable law. To clarify this holding, we must review the most recent applicable law.
In Brown v. Firestone, 382 So.2d 654 (Fla.1980), the supreme court outlined and compared the general scope of authority conferred upon each branch of government in the field of general appropriation law, and acknowledged that any citizen/taxpayer may bring a declaratory action to challenge the constitutionality of provisions in a general appropriations act. After analyzing each of the challenged sections of the general appropriations act at issue, the court admonished that "it would be a serious mistake to interpret our acceptance of jurisdiction in this cause as a general willingness to thrust the Court into the political arena and referee on a biennial basis the assertions of power of the executive and legislative branches in relation to the appropriations act." Id. at 671.
In Coalition for Adequacy and Fairness in School Funding, Inc. v. Chiles, 680 So.2d 400 (Fla.1996), various school boards and others filed a declaratory action against state officials, asserting that the state had failed to allocate adequate resources for a uniform system of free public schools as required by Article IX, section 1. After analyzing the meaning of the term `adequacy' by reviewing the historical evolution of Article IX, section 1, in light of the separation of powers doctrine, the supreme court affirmed the trial court's dismissal of the suit, finding that the plaintiffs had made "a blanket assertion" that the entire system was constitutionally inadequate, but that they had "failed to demonstrate in their allegations, or in their arguments on appeal, an appropriate standard for `adequacy' that would not present a substantial risk of judicial intrusion into the powers and responsibilities assigned to the legislature, both generally (in determining appropriations) and specifically (in providing by law for an adequate and uniform system of education)" (emphasis in the original). Id. at 408. In a concurring opinion, Justice Overton asserted that the intent of Article IX, section 1, "is to require the establishment of an educational system that fulfills the basic educational needs of the citizens of this state to provide for a literate, knowledgeable population." Id. at 409. He observed that "[w]hile `adequate' may be difficult to quantify, certainly a minimum threshold exists below which the funding provided by the legislature would be considered `inadequate'" and he acknowledged that "a proper showing of inadequacy has not been made in this case." Id.
Prior to 1998, when it was amended to its current version, at least in part in response to Coalition, Article IX, section 1, of the Florida Constitution provided:
System of public education.
Adequate provision shall be made by law for a uniform system of free public schools and for the establishment, maintenance and operation of institutions of higher learning and other public education *602 programs that the needs of the people may require.
As amended, Article IX, section 1(a), provides:
Public education.
(a) The education of children is a fundamental value of the people of the State of Florida. It is, therefore, a paramount duty of the state to make adequate provision for the education of all children residing within its borders. Adequate provision shall be made by law for a uniform, efficient, safe, secure, and high quality system of free public schools that allows students to obtain a high quality education and for the establishment, maintenance, and operation of institutions of higher learning and other public education programs that the needs of the people may require.
In Bush v. Holmes, 919 So.2d 392 (Fla. 2006), the supreme court affirmed a ruling that the statute establishing the school voucher program was unconstitutional, finding that the statute violated the requirement of Article IX, section 1, that education be provided through "a uniform system of free public schools." The court noted that as a general rule, "courts may not reweigh the competing policy concerns underlying a legislative enactment," but that "the usual deference given to the Legislature's resolution of public policy issues is at all times circumscribed by the Constitution." Id. at 398. It found that through the challenged statute, "the state is fostering plural, nonuniform systems of education in direct violation of the constitutional mandate for a uniform system of free public schools." Id. The court noted Justice Overton's concurring opinion in Coalition, as well as the 1998 amendment to Article IX, section 1, and the commentary indicating that the amendment was intended in part to define "adequate provision" by requiring the public school system to be "efficient, safe, secure, and high quality." It held that Article IX, section 1, "mandates that the state's obligation is to provide for the education of Florida's children, specifies that the manner of fulfilling this obligation is by providing a uniform, high quality system of free public education, and does not authorize additional equivalent alternatives." Id. at 408. It found that the school voucher program "does not supplement the public education system," but instead "diverts funds that would otherwise be provided to the system of free public schools that is the exclusive means set out in the Constitution for the Legislature to make adequate provision for the education of children." Id. It found that the challenged statute "by its very nature undermines the system of `high quality' free public schools that are the sole authorized means of fulfilling the constitutional mandate to provide for the education of all children residing in Florida." Id.
We read Brown, Coalition, and Holmes as delineating that any citizen/taxpayer may bring a declaratory action to challenge the constitutionality of provisions in a general appropriations act, including a claim that the state has failed to make adequate provision for a uniform system of free public schools as required by Article IX, section 1, and that the standard for determining whether the legislature has made adequate provision for public schools is whether the resources allocated by the legislature are sufficient to provide "a uniform, efficient, safe, secure, and high quality system of free public schools that allows students to obtain a high quality education," as required by the Florida Constitution. The trial judge properly dismissed count III of the original complaint because the allegations did not state such a cause of action, but rather merely challenged the method of distribution of state education funds. We wish to clarify, however, that the judge's reliance on Simon v. Celebration Co. was misplaced.
*603 In Simon, parents sought declaratory relief and damages in tort, alleging that they had relocated to the Town of Celebration based upon misrepresentations regarding its public school. The trial court dismissed count II, which alleged that the local school board had failed to provide their children with a high quality free public education, ruling that no private cause of action exists for the enforcement of Article IX, section 1, against individual school boards. The DCA affirmed that ruling, citing the test for determining whether a constitutional provision is self-executing, and therefore creates a private cause of action for its enforcement, as "whether or not the provision lays down a sufficient rule by which the right or purpose which it gives or is intended to accomplish may be determined, enjoyed, or protected without the aid of legislative enactment." 883 So.2d at 831. We consider the holding in this case to be that no private cause of action exists for the enforcement of Article IX, section 1, against individual school boards because the clause, in the words of the district court, "specifically states that the provision of an adequate education must be made by the Legislature since the provision states that `adequate provision shall be made by law.'" Id. We consider the district court's observation that "there is no benchmark for determining what `adequate provision for education' is meant to entail, nor is the term `high quality education' defined in the provision," to be dicta which has been brought into question by the supreme court's observations in Bush v. Holmes.
The trial judge's rulings in this case are AFFIRMED.
BROWNING, C.J. and VAN NORTWICK, J., concur.
NOTES
[1] In an affidavit in support of the defendants' motion for summary judgment, Dr. Dewey explained that while the FPLI was originally developed for use in computing the DCD, it "has come to be a useful source of data for wider audiences," and that although the low-centrality FPLI_AS "is the more representative index for measuring variation across school districts in the average cost to hire equally qualified teaching personnel," the other three FPLI iterations in the 2003 FPLI report "have appropriate uses in other contexts and are of general interest to other groups, and were therefore included."
[2] The 2005-2006 General Appropriations Act, chapter 2005-70, Laws of Florida, provided $22.7 million in "DCD transition supplement" appropriations to school districts, including appellants. The 2006-2007 General Appropriations Act, chapter 06-25, Laws of Florida, provided $22.7 million in "DCD transition supplement" appropriations to school districts, including appellants.
[3] Article III, section 12, provides:

Appropriations bills.Laws making appropriations for salaries of public officers and other current expenses of the state shall contain provisions on no other subject.
[4] Article IX, section 1(a), provides:

Public education.
(a) The education of children is a fundamental value of the people of the State of Florida. It is, therefore, a paramount duty of the state to make adequate provision for the education of all children residing within its borders. Adequate provision shall be made by law for a uniform, efficient, safe, secure, and high quality system of free public schools that allows students to obtain a high quality education and for the establishment, maintenance, and operation of institutions of higher learning and other public education programs that the needs of the people may require.