81 So.3d 465 (2011)
Mike HARIDOPOLOS, in his official capacity as the Florida Senate President; Dean Cannon, in his official capacity as the Florida Speaker of the House of Representatives; Dr. Eric J. Smith, in his official capacity as Florida Commissioner of Education; and Florida State Board of Education, Petitioners,
v.
CITIZENS FOR STRONG SCHOOLS, INC.; Fund Education Now; Eunice Barnum; Janiyah Williams; Jacque Williams; Sheila Andrews; Rose Nogueras; and Alfredo Nogueras, Respondents.
No. 1D10-6285.
District Court of Appeal of Florida, First District.
November 23, 2011.
Rehearing Denied January 6, 2012.
*466 Pamela Jo Bondi, Attorney General, Scott D. Makar, Solicitor General, Jonathan Glogau, Special Counsel, Timothy Osterhaus, Deputy Solicitor General, and Lois S. Tepper, Interim General Counsel, Department of Education, Tallahassee, for Petitioners.
Jodi Siegel, Neil Chonin, Natalie N. Maxwell, Southern Legal Counsel, Inc., Gainesville, E. Thom Rumberger of Rumberger, Kirk & Caldwell, Tallahassee, Jon L. Mills of Boies, Schiller & Flexner, Miami, Timothy McLendon, Gainesville, and Deborah Cupples, Gainesville, for Respondents.

EN BANC
BENTON, C.J.
After the trial judge denied their motion to dismiss respondents' amended complaint for declaratory and supplemental relief, the President of the Florida Senate, the Speaker of the Florida House of Representatives, the Commissioner of Education, and the State Board of Education filed a petition for writ of prohibition, initiating original proceedings here in an effort to bring further proceedings in the circuit court to a halt. Because the present case lies at the intersection of well established rules governing writs of prohibition and significant, but unsettled, questions about Florida's "paramount duty" to provide "for the education of all children residing within its borders," Art. IX, § 1(a), Fla. Const., we deny the petition for writ of prohibition, but certify a question of great public importance to the Supreme Court of Florida.
Petitioners are defendants in the pending lawsuit that two not-for-profit corporations, two students attending public schools in Duval County, and four parents *467 or guardians of students attending public school, either in Duval or in Pasco Counties,[1] brought in Leon County Circuit Court. The respondents' amended complaint for declaratory and supplemental relief, which the trial court declined to dismiss, alleges wide-ranging violations of article IX, section 1(a), which states, in relevant part:
The education of children is a fundamental value of the people of the State of Florida. It is, therefore, a paramount duty of the state to make adequate provision for the education of all children residing within its borders. Adequate provision shall be made by law for a uniform, efficient, safe, secure, and high quality system of free public schools that allows students to obtain a high quality education. . . .
Art. IX, § 1(a), Fla. Const. In the course of its 135 paragraphs, respondents' amended complaint alleges a failure to make adequate provision "for a uniform, efficient, safe, secure, and high quality system of free public schools" by, e.g., providing insufficient funding for public education, shifting responsibility for educational funding to local governments, providing inadequate resources for teachers' salaries in particular, and adopting a so-called accountability policy that is an obstacle to high quality.
The amended complaint alleges that Florida's public schools are not safe and secure, that graduation rates are too low, that student promotion and retention policies are ineffective, that results of achievement tests reveal various inadequacies, and much more. Petitioners moved to dismiss the amended complaint, relying on Coalition for Adequacy and Fairness in School Funding, Inc. v. Chiles, 680 So.2d 400, 407 (Fla.1996), for the proposition that the amended complaint raises only nonjusticiable "political" questions, see Baker v. Carr, 369 U.S. 186, 209, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), questions which the trial courtand, indeed, any court (according to the petitioners)lacks jurisdiction to entertain. Rejecting petitioners' argument that it lacked jurisdiction to decide any facet of any one of the respondents' claims, the trial court denied the motion to dismiss.
"`In this state, circuit courts are superior courts of general jurisdiction, and nothing is intended to be outside their jurisdiction except that which clearly and specially appears so to be.'" Mandico v. Taos Constr., Inc., 605 So.2d 850, 854 (Fla.1992) (quoting English v. McCrary, 348 So.2d 293, 297 (Fla. 1977)). The petitioners' apprehension at the prospect of burdensome discovery demands unduly discounts the protections they and all litigants will enjoy because any discovery that may occur will take place under the supervision of the able trial judge, if and as needed. More fundamentally, the petitioners' asserted concerns about discovery do not speak to the only issue that is germane in prohibition proceedings: the nature and extent of the lower tribunal's jurisdiction. A court of general jurisdiction, the circuit court has statutory authority to entertain claims for declaratory judgment. See §§ 86.011 and 86.061, Fla. Stat. (2010). Even if erroneous, the denial of a motion to dismiss is ordinarily no occasion for a reviewing court's intervention in a proceeding pending in a trial court: "That a non-final order puts the parties to the expense of a trial that an appeals court may later determine to have been unnecessary is not a proper ground *468 for the grant of a petition for writ of common law certiorari. Every order denying a motion to dismiss is of this nature." Naghtin v. Jones, 680 So.2d 573, 576 (Fla. 1st DCA 1996). See Leibman v. Sportatorium, Inc., 374 So.2d 1124, 1124 (Fla. 4th DCA 1979) (that petitioner might have to go through an unnecessary trial did not constitute material injury of an irreparable nature warranting grant of an extraordinary writ); Siegel v. Abramowitz, 309 So.2d 234, 235 (Fla. 4th DCA 1975) (facts that petitioner would have to go through trial under the burden of the order complained of, would incur substantial expenses for experts and that, after all that, case might need to be retried held insufficient to show irreparable harm).
No appeal was taken from the denial of the petitioners' motion to dismiss the amended complaint, nor could any appeal have been taken from that interlocutory ruling: With exceptions not pertinent here, see Fla. R.App. P. 9.130(c), a "defendant cannot appeal a nonfinal order which denies a motion to dismiss . . . Fla. R.App. P. 9.130(a)." Pub. Health Trust of Dade Cnty. v. Diaz, 529 So.2d 682, 684 (Fla. 1988). Instead, the defendants below instituted the present prohibition proceeding here in an effort to stymie further proceedings in the circuit court.
Prohibition is the extraordinary (or prerogative) writ a court issues in order to prevent an inferior court (or other inferior tribunal) from exercising jurisdiction over matters that lie outside the lower tribunal's jurisdiction. See English, 348 So.2d at 296. Only where a tribunal purports to exercise jurisdiction over a case falling within a class of cases it is forbidden to consider is it appropriate for a higher court to grant the extraordinary writ of prohibition. As long as a lower court has subject matter jurisdiction, defined as "the power of the court to deal with the class of cases to which the particular case belongs," Lovett v. Lovett, 93 Fla. 611, 112 So. 768, 775 (1927), proceedings should be permitted to run their course there, with resort to appeal after the lower court proceedings conclude, if necessary to correct judicial error.[2]
Prohibition lies to redress an inferior tribunal's usurpation of jurisdiction, but it does not lie to prevent mere error in the exercise of the inferior tribunal's jurisdiction. See English, 348 So.2d at 298. Prohibition is unavailable to divest a lower tribunal of jurisdiction to hear and determine its own jurisdiction, or to test the correctness of a jurisdictional determination that depends on fact finding the lower tribunal is charged with making. See Mandico, 605 So.2d at 854. The writ is *469 narrow in scope, is to be employed with great caution, and, our supreme court has even said, is to be utilized only in "emergencies." See English, 348 So.2d at 296. There is no emergency here.
The trial court has been asked to construe the Florida Constitution, not the constitution of any other state. But analogous questions have arisen under the constitutions of other states, and the majority rule is that educational adequacy provisions in state constitutions are judicially enforceable. The court in Committee for Educational Rights v. Edgar, 174 Ill.2d 1, 220 Ill.Dec. 166, 672 N.E.2d 1178 (1996), cited in the dissenting opinion, recognizes that the contrary view, viz., that such questions are nonjusticiable, is a minority view:
We are well aware that courts in other jurisdictions have seen fit to define the contours of a constitutionally guaranteed education and to establish judicial standards of educational quality reflecting varying degrees of specificity and deference to the other branches of government. See, e.g., Campbell County School District v. State, 907 P.2d 1238, 1265 (Wyo.1995); Campaign for Fiscal Equity, Inc. v. State, 86 N.Y.2d 307, 317-19, 655 N.E.2d 661, 666-76, 631 N.Y.S.2d 565, 570-71 (1995); Claremont School District v. Governor, 138 N.H. 183, 192, 635 A.2d 1375, 1381 (1993); McDuffy v. Secretary of the Executive Office of Education, 415 Mass. 545, 606, 615 N.E.2d 516, 548 (1993); Tennessee Small School Systems v. McWherter, 851 S.W.2d 139, 147-48 (Tenn.1993) (dicta); Abbott v. Burke, 119 N.J. 287, 303-04, 575 A.2d 359, 367 (1990); Rose v. Council for Better Education, Inc., 790 S.W.2d 186, 208-09 (Ky.1989); Pauley v. Kelly, 162 W.Va. 672, 705-06, 255 S.E.2d 859, 874 (1979); Seattle School District No. 1 v. State, 90 Wash.2d 476, 502, 585 P.2d 71, 86-87 (1978); see also Idaho Schools for Equal Educational Opportunity v. Evans, 123 Idaho 573, 583-84, 850 P.2d 724, 734 (1993) (holding that it was court's duty to interpret constitutional "thoroughness" requirement, but adopting standards promulgated by the executive branch); Unified School District No. 229 v. State, 256 Kan. 232, 275, 885 P.2d 1170, 1186 (1994) (court would not substitute its judgment as to what type of education was "suitable" within the meaning of the constitution for the standards developed by the legislature and state department of education; where all schools were able to meet those standards, the school finance statute was upheld); McDaniel v. Thomas, 248 Ga. 632, 633, 643-44, 285 S.E.2d 156, 157, 165 (1981) (while holding that the question of whether financing system deprived children of constitutionally guaranteed "adequate education" was justiciable, court would only inquire whether system met a lower standard of providing a minimum or basic education; because of the inherent difficulty in establishing a judicially manageable standard for determining whether or not pupils are being provided an "adequate education," legislative branch must give content to the term "adequate").
Id. at 1191-92. Although the Edgar court declined to decide whether educational institutions and services in Illinois were "high quality," it did apparently address and decide the question whether the present school funding system was "efficient" within the meaning of the Illinois Constitution.[3]Id. at 1183. As in the cases the Edgar court cited, in "Lake View School Dist. No. 25 of Phillips County v. Huckabee, *470 349 Ark. 116, 76 S.W.3d 250 (2002), the court held that the constitutionality of the public school funding system was a justiciable issue." Meira Schulman Ferziger, Annotation, Procedural Issues Concerning Public School Funding Cases, 115 A.L.R. 5th 563, § 4(a) (2004). See also Leandro v. State, 346 N.C. 336, 488 S.E.2d 249, 253 (1997).
The Idaho Supreme Court said in Evans, rejecting the argument that it should not involve itself "in the complicated determination of what is a `thorough' education" and should instead defer to the other branches of government:
Mindful that "[a]rguments erupt at the drop of a hat as to what is or is not necessary in an educational system [and as to] what is or is not a frill," Thompson [v. Engelking, 96 Idaho 793, 814, 537 P.2d 635, 656 (1975)] (Shepard, J. concurring), and that this Court is not well equipped to legislate "in a turbulent field of social, economic and political policy," Thompson, 96 Idaho at 798, 537 P.2d at 640, we decline to accept the respondents' argument that the other branches of government be allowed to interpret the constitution for us. That would be an abject abdication of our role in the American system of government.
Passing on the constitutionality of statutory enactments, even enactment with political overtones, is a fundamental responsibility of the judiciary, and has been so since Marbury v. Madison, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1813) [1803].

Miles v. Idaho Power [Co., 116 Idaho 635, 640, 778 P.2d 757, 762 (1989)].
850 P.2d at 734. We are unwilling to hold, as petitioners urge, that it is a foregone conclusion that the circuit court cannot pass on the constitutionality of any statutory enactment affecting the provision of "a uniform, efficient, safe, secure and high quality system of free public schools." Fla. Const. Art. IX, § 1.
Petitioners argue that the respondents' sweeping challenge to the adequacy of Florida's education system bears a strong resemblance to the challenge that failed in Coalition,[4] and that "blanket assertions" about Florida's entire educational system cannot give rise to circuit court jurisdiction; they assert that the political question doctrine precludes adjudication of cases involving broad claims of an inadequate educational system in Florida. The supreme court did rule against the Coalition plaintiffs on appeal, on grounds that judicial intervention without appropriate standards for determining "adequacy" *471 would create a "substantial risk of judicial intrusion into the powers and responsibilities assigned to the legislature, both generally (in determining appropriations) and specifically (in providing by law for an adequate and uniform system of education)." Coalition, 680 So.2d at 408. The same can be said here, petitioners maintain, arguing that the judicial relief respondents seek includes additional state spending on education, even though no court has authority to order such relief. See Art. V, § 14(d), Fla. Const. ("The judiciary shall have no power to fix appropriations.").
This argument is available to the petitioners on appeal, if and when they suffer an adverse judgment in the proceedings pending below. But the appellants in Coalition were in a different procedural posture than the petitioners occupy in the present case. The Coalition plaintiffs lost in the trial court, and then appealed the final judgment dismissing their claims. In the present case, the plaintiffs merely cleared a preliminary hurdle in the trial court, when the defendants' motion to dismiss was denied. The defendants are here seeking to derail proceedings in the trial court before they can conclude there.
Even a cursory glance at the three separate opinions the Coalition decision yielded reveals that at least a majority of the justicesJustices Overton, Shaw, Kogan and Ansteadwere of the view that the circuit court had jurisdiction to decide claims of constitutional inadequacy. Justices Grimes, Harding and Wells joined the majority per curiam opinion in Coalition, affirming the final judgment that had dismissed the constitutional challenge to educational adequacy. Justices Anstead, Kogan and Shaw dissented in part, voting not to affirm but to "reverse the dismissal of this action and remand for further proceedings so that a factual context can be established for determining whether the legislature has complied with the mandate of the people of Florida to make adequate provision for a uniform system of free public schools." 680 So.2d at 410 (Anstead, J., dissenting). Justice Overton, who can be viewed as casting the deciding vote, wrote a concurring opinion "agree[ing] with the majority that a proper showing of inadequacy has not been made in this case," but making clear that a cause of action for failure to meet the requirements of Article IX, section 1(a) could be pleaded: "For example, were a complaint to assert that a county in this state has a thirty percent illiteracy rate, I would suggest that such a complaint has at least stated a cause of action under our education provision." Id. at 409 (Overton, J., concurring).
The constitutional provision at issue, Article IX, section 1, was amended in 1998, moreover, to describe education as a "fundamental value" and a "paramount duty of the state," and to require that adequate provision be made by law not only for a "uniform" system of free public education, but also for a system that is "efficient, safe, secure, and high quality." Our supreme court has since interpreted the 1998 amendment as a response to the Coalition decision, a change in language intended to "`provide constitutional standards to measure the "adequacy" provision found in the second sentence of section 1.'" Bush v. Holmes, 919 So.2d 392, 404 (Fla.2006) (quoting William A. Buzzett and Deborah K. Kearney, Commentary to 1998 Amendment, 26A, Fla. Stat. Ann., Art. IX, § 1, Fla. Const. (West Supp. 2006)).[5]
*472 In keeping with the commentary it quoted, the court characterized the amendment in Bush v. Holmes as "provid[ing] standards by which to measure the adequacy of the public school education provided by the state," id. at 403, stating that the revised constitutional provision "sets forth how the state is to carry out [the] education mandate, specifically, that `[a]dequate provision shall be made by law for a uniform, efficient, safe, secure, and high quality system of free public schools.'" Id. at 405. We are, of course, bound by the decision of the supreme court in Bush v. Holmes. Albeit in obiter dicta, we said as much in School Board of Miami-Dade County v. King, 940 So.2d 593, 602 (Fla. 1st DCA 2006):
We read Brown[ v. Firestone, 382 So.2d 654 (Fla.1980)], Coalition, and Holmes as delineating that any citizen/taxpayer may bring a declaratory action to challenge the constitutionality of provisions in a general appropriations act, including a claim that the state has failed to make adequate provision for a uniform system of free public schools as required by Article IX, section 1, and that the standard for determining whether the legislature has made adequate provision for public schools is whether the resources allocated by the legislature are sufficient to provide "a uniform, efficient, safe, secure, and high quality system of free public schools that allows students to obtain a high quality education," as required by the Florida Constitution.
The present case is, to be sure, distinguishable from King, which featured an attack on internal legislative processes, an attack we were unwilling to allow. Nor is the present case one where "the authority of each house of the legislature, vis-a-vis article III, section 4(a) and article II, section 3 of the Florida Constitution, to determine its own internal procedure is at issue and ... neither the constitutionality of any enacted statute, nor any policy commitment of the state of Florida, nor the balancing of compelling interests of the state are at issue." Moffitt v. Willis, 459 So.2d 1018, 1020-21 (Fla.1984).
In the present case, no claim depends on any procedure internal to the Legislature, and the educational "policy commitment of the state of Florida" is very much at issue. *473 We cannot say categorically that not a single one of respondents' claims entitles the respondents to declaratory judgment which, of course, may or may not uphold the plaintiffs' position(s) on the merits. The dissenting opinion argues that "the trial court's order denying the petitioners' motion to dismiss violates the separation of powers because it violates the people's fundamental right to enact education policies through their elected representatives." Post, p. 18. The order denying the motion to dismiss does no such thing. Proceedings below have scarcely begun and their outcome is uncertain. If and when the petitioners suffer an adverse judgment, plenary review is available.
Constrained to deny the petition for writ of prohibition, we do so with utmost respect for a coequal branch of government; and do so even though we are well aware that the constitutional duty to ensure that adequate provision is made for public education is the Legislature's in the first instance: The constitutional provision at issue begins with these words: "Adequate provision shall be made by law ...." Art. IX, § 1(a), Fla. Const. (emphasis supplied). While the jurisdiction of the court below to grant declaratory relief requires that we deny the petition for writ of prohibition, we are uncertain as to whetherand do not decide thatthe trial court has any ability to grant relief beyond that point.
Recognizing the good faith in which the petition for writ of prohibition has been filed, and the importance of interbranch cooperation in discharging "a paramount duty of the state," Art. IX, § 1(a), Fla. Const., we certify the following question:
DOES ARTICLE IX, SECTION 1(A), FLORIDA CONSTITUTION, SET FORTH JUDICIALLY ASCERTAINABLE STANDARDS THAT CAN BE USED TO DETERMINE THE ADEQUACY, EFFICIENCY, SAFETY, SECURITY, AND HIGH QUALITY OF PUBLIC EDUCATION ON A STATEWIDE BASIS, SO AS TO PERMIT A COURT TO DECIDE CLAIMS FOR DECLARATORY JUDGMENT (AND SUPPLEMENTAL RELIEF) ALLEGING NONCOMPLIANCE WITH ARTICLE IX, SECTION 1(A) OF THE FLORIDA CONSTITUTION?
Accordingly, for the reasons stated, the petition for writ of prohibition is denied, and the foregoing question is certified to the Supreme Court of Florida as being a question of great public importance.
DAVIS, VAN NORTWICK, PADOVANO, LEWIS, CLARK, and MARSTILLER, JJ., concur.
WOLF, J., specially concurs.
ROBERTS, J., dissents in an opinion with which HAWKES, THOMAS, WETHERELL, ROWE, RAY, and SWANSON, JJ., concur.
WOLF, J., Specially Concurring.
This is a difficult case because it involves a clash of two extremely important precepts: the concept of separation of powers enumerated in article II, section 3 of the Florida Constitution, and the right of the people to have their will concerning the adequacy of the state's education system, as expressed in an amendment to article IX, section 1 of the constitution, implemented.[6]
As expressed in Judge Roberts' dissenting opinion, the power to appropriate funds and the power to determine the sufficiency of funding for educational purposes *474 is in the people's representative, the legislative branch. The judiciary has been, and should be, reluctant to intrude on this power. See Coalition for Adequacy & Fairness in School Funding, Inc. v. Chiles, 680 So.2d 400, 407 (Fla.1996).
On the other hand, the Florida Constitution is a document of the people. See Art. I, § 3, Fla. Const.; see also Rivera-Cruz v. Gray, 104 So.2d 501, 505-06 (Fla.1958) (Terrell, C.J., concurring specially). The people's will is expressed through the adoption of constitutional language. The difficult issue is when do the people have a right to enforce their will, as it is expressed in the constitution, through the court system.
The first question that needs to be asked in this inquiry is whether the constitutional provision in question may be interpreted as being self-executing, because a self-executing provision is one that may be enforced without legislative enactment. The test for determining whether a provision is self-executing is whether "the provision lays down a sufficient rule by means of which the right or purpose which it gives or is intended to accomplish may be determined, enjoyed, or protected without the aid of legislative enactment." Advisory Opinion to the Attorney Gen. re Extending Existing Sales Tax to Non-Taxed Servs. Where Exclusion Fails to Serve a Pub. Purpose, 953 So.2d 471, 484 (Fla. 2007).
Clearly, it was the intent of the Constitutional Revision Commission that drafted the 1998 amendment to article IX, section 1 of the Florida Constitution to address the decision in Coalition, 680 So.2d 400, by adding language to further elucidate the public's desires concerning the public education system. Unfortunately, this language still did not provide measurable goals by which the court could judge legislative performance and enforce the provision in any particular manner. This case is similar to Advisory Opinion to the Governor-1996 Amendment 5 (Everglades), 706 So.2d 278, 279-82 (Fla.1997), where the public expressed its strong desire that polluters be "primarily responsible" for cleaning up the Everglades, yet the court held the amendment was not self-executing. Similarly, the public's desires here are not sufficiently definite to allow for enforcement without some measurable standards.[7] In addition, the language of article IX, section 1, itself states that the adequate provision of these fundamental values "shall be made by law," indicating the provision is not self-executing. See St. John Medical Plans, Inc. v. Gutman, 721 So.2d 717, 719 (Fla.1998) (finding the language of the constitutional provision that included the unambiguous phrase "as provided by law" clearly evidenced the provision was not self-executing). This language is at most a directive to the Legislature to act to pursue the fundamental values identified in the proviso rather than a requirement to act in any specific matter.
Even if a constitutional provision is not self executing, it does not necessarily mean the public is totally without a remedy if it feels the legislative branch has ignored its wishes. In Dade County Classroom Teachers Ass'n, Inc. v. Legislature, 269 So.2d 684, 688 (Fla.1972), the Florida Supreme Court denied the petitioners' writ of mandamus seeking to require *475 the Legislature to adopt implementing legislation enforcing the non-self-executing right of public employees to collectively bargain in conformity with article I, section 6 of the Florida Constitution. However, in doing so, the court noted that if the Legislature did not adopt the implementing legislation, the court would "have no choice but to fashion such guidelines by judicial decree in such manner as may seem to the Court best adapted to meet the requirements of the constitution." Id. The remedy suggested in Dade County, 269 So.2d at 688, is one that should only be utilized to enforce basic fundamental interests enumerated in the constitution and where there has been a clear showing that the Legislature has failed to address the public's will in a reasonable period of time. Requiring implementing legislation does not specifically intrude on the Legislature's power of appropriation or on its ability to identify and adopt specific measurable standards to implement the amendment.
In the instant case, the allegations of the complaint, taken as true, indicate a clear failure of the Legislature over a reasonable period of time to assure the fundamental values identified within the amendment were being met. While the remedy suggested by this opinion was not specifically requested by the respondents, they did ask for any other "relief the court deems proper." In addition, the complaint requested the adoption of a "remedial plan... which includes necessary studies to determine what resources and standards are necessary to provide a high quality education to Florida students." A request for implementing legislation is necessarily contained within these requests for relief.[8] Thus, I do not believe the trial court was totally without jurisdiction to address the allegations within the complaint. I, therefore, concur in the decision to deny the writ of prohibition.
ROBERTS, J., dissenting.
In Coalition for Adequacy & Fairness in School Funding, Inc. v. Chiles, 680 So.2d 400, 402 (Fla.1996), the plaintiffs filed a complaint seeking declaratory relief challenging the funding of the state school system of K-12 education. They alleged that the funding and policies adopted by the legislature did not meet the requirements of article IX, section 1 of the Florida Constitution. They asked the trial court to declare that an adequate education was a fundamental right under the Constitution and that the state had failed to make adequate provision for a uniform system of free public schools as provided for in the Constitution. The trial court dismissed the complaint with prejudice finding that, to grant relief, it would have to usurp or intrude upon the appropriation power exclusively reserved to the legislature. The trial court also found that the complaint presented a non-justiciable political question. Id.
On appeal, the Florida Supreme Court affirmed the trial court's dismissal. Id. at 402, 408. The court first examined the text of article IX, section 1 of the Constitution, which provided:

Adequate provision shall be made by law for a uniform system of free public *476 schools and for the establishment, maintenance and operation of institutions of higher learning and other public education programs that the needs of the people may require.
Id. at 405 (emphasis supplied). To determine whether the case involved a non-justiciable political question, the court adopted the test from Baker v. Carr, 369 U.S. 186, 209, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), which set forth the following six criteria:
(1) a textually demonstrable commitment of the issue to a coordinate political department; (2) a lack of judicially discoverable and manageable standards for resolving it; (3) the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; (4) the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; (5) an unusual need for unquestioning adherence to a political decision already made; and lastly (6) the potentiality of embarrassment from multifarious pronouncements by various departments on one question.
Coalition, 680 So.2d at 408. The court focused on the second criterion, specifically whether the command of the Constitution for "adequate provision" for schools provided judicially discoverable and manageable standards that could be used to decide the case. Id.
The court agreed with the trial court's statement that there was no textually demonstrable guidance in article IX, section 1, from which the courts could decide in the abstract whether a certain level of state funds was adequate. Id. at 406. The court further agreed with the trial court's statement:
To decide such an abstract question of "adequate" funding, the courts would necessarily be required to subjectively evaluate the Legislature's value judgments as to the spending priorities to be assigned to the state's many needs, education being one among them. In short, the Court would have to usurp and oversee the appropriations power, either directly or indirectly, in order to grant the relief sought by Plaintiffs.
Id. at 406-07.
In the instant case, the respondents filed a declaratory judgment action alleging that the state appropriations act and the statutes relating to K-12 education are unconstitutional.[9] In support of their action, the respondents allege: (1) the statutes do not provide enough money in the aggregate to the public school system; (2) the statutes do not allocate the money appropriately across the state; (3) the statutes do not adequately identify pressing needs in the system or make adequate provision therefore; (4) the per-pupil expenditure by the state has decreased in recent years; (5) the state education budget has eliminated funding for seventh period and summer school; (6) the statutes have allowed too many students for each writing teacher; (7) teacher salaries are too low, and teachers are under qualified; (8) the FCAT results in a lower quality education; (9) schools are not "safe and secure" because the number of students reporting being threatened at school and the number of reported fights at school are above the national average; (10) graduation rates are inadequate; (11) grade promotion and retention are inadequate; and (12) insufficient resources are allotted to *477 special education. These allegations are the same type of allegations that were before the court in Coalition. The respondents believe, as did the appellants in Coalition, that many of the programs in the school system were not adequately funded, could be administered differently, or both.
In 1998, article IX, section 1 was amended to provide:
The education of children is a fundamental value of the people of the State of Florida. It is, therefore, a paramount duty of the state to make adequate provision for the education of children residing within its borders. Adequate provision shall be made by law for a uniform, efficient, safe, secure, and high quality system of free public schools that allows students to obtain a high quality education[.]
As such, we must examine whether the amendment cures the defect identified in Coalition. In other words, we must decide whether the amendment provides standards by which the judiciary can measure the statutes challenged to determine whether they are constitutional.
In Coalition, the court held that the term "adequate provision" did not provide any guidance in determining whether the school system met constitutional requirements. The amendment emphasizes the importance of education in the state by declaring it to be "a fundamental value" and makes it "a paramount duty" to make "adequate provision" for the education of students. The term "adequate provision" was amplified to mean "a uniform, efficient, safe, secure, and high quality system of free public schools that allows students to obtain a high quality education."
The respondents challenge whether our state's school system of K-12 education is efficient, safe, secure, and high quality. Certainly, the purpose of the amendment was to send a signal to the policymakers of Florida stressing the importance of education. However, even though the additional language clearly expresses an emphasis on education, it does not provide any more of a justiciable standard than the "adequate provision" command did in Coalition. The terms "efficient, safe, secure, and high quality" do not lend themselves to a "yes or no" evaluation. The terms are adjectives of degree, meaning that even an unlimited amount of resources and ideal policies and administration could not provide a guarantee of perfect efficiency, safety, security or quality. The Constitution does not provide guidance to courts in determining how efficient, safe, secure or high quality the school system is required to be.[10] Rather, the terms require a policy judgment regarding whether the system is efficient, safe, secure or high quality. Whether the legislature has created a system that meets the requirements expected by our citizens will have to be judged by the citizens themselves. For a court to attempt to determine whether the school system is efficient, safe, secure or high quality would require the court to substitute its own judgment for the policy decisions made by the other branches of the government.
Indeed, the respondents acknowledge in their response to the petitioners' motion to dismiss that the trial court will be "required to listen to experts, make findings of fact and draw legal conclusions" in its effort to fashion a standard. The 160 *478 elected representatives of the people have enacted statutes attempting to implement all of the constitutional commands regarding education in Chapters 1000-1013, Florida Statutes (2011), comprising 490 pages of the statutes. Additionally, the state has provided in excess of $12 billion for PK-12 education in this budget year, exclusive of Public Education Capital Outlay funds. Both the statutes and the appropriations act involved the input of experts, teachers, school district officials, state education officials, parents, and other interested citizens numbering in the thousands. The legislative and executive branches were required to make policy judgments to implement the Constitution within the resources available. The respondents would have the courts first create a standard by which to determine whether the schools are efficient, safe, secure, and high quality, and then substitute the policy judgments of the judicial branch for those of the legislative and executive branches.
The majority cites to Bush v. Holmes, 919 So.2d 392 (Fla.2006), for the proposition that, when drafting the 1998 amendment, the Constitutional Revision Commission intended to provide enforceable standards and correct the deficiency of Coalition. However, in Holmes, the court recognized that the Commission originally considered using the term "fundamental right," but chose the term "fundamental value" instead to avoid state liability for citizens' dissatisfaction with the school system. 919 So.2d at 403-04. Whether the Commission intended to create a justiciable standard is ultimately irrelevant. The test is whether an enforceable standard was actually created by the text of the amendment itself. Because the terms "efficient, safe, secure, and high quality" are no more susceptible to judicial enforcement than the term "adequate," this claim cannot be enforced by the courts.
Regarding the legal basis for granting the writ, it is simple: the trial court's order denying the petitioners' motion to dismiss violates the separation of powers because it violates the people's fundamental right to enact education policies through their elected representatives. Florida law requires a strict separation of powers, as mandated under article II, section 3 of the Constitution. See Fla. House of Representatives v. Crist, 999 So.2d 601, 611 (Fla.2008) ("In construing our constitution, we have `traditionally applied a strict separation of powers doctrine.'"). Thus, the instant case should be barred in prohibition to prevent a costly violation of article II, section 3.
We need look no further than the respondents' own claims to find that this case impermissibly intrudes on the legislative branch's powers. For example, in their amended complaint, they allege that the legislature has failed to provide sufficient funding for education. Their prayer for relief requests that the trial court order the petitioners to establish a remedial plan that conforms with the Constitution by providing a high quality school system that allows students to obtain a high quality education, and requires studies to determine the resources and standards necessary to do so. In other words, the respondents seek a declaratory judgment that would somehow define the standards that are missing in article IX, section 1, and set minimum appropriation levels. This is made clear in that the respondents also demand that that the trial court retain jurisdiction to enforce its order and grant any other relief it deems proper. Courts, however, cannot appropriate funds. See Art. II, § 3, Fla. Const. ("No person belonging to one branch shall exercise any powers appertaining to either of the other branches unless expressly provided herein."); Art. V, § 14(d), Fla. Const. ("The judiciary *479 shall have no power to fix appropriations."); Art. VII, § 1(c), Fla. Const. ("No money shall be drawn from the treasury except in pursuance of appropriation made by law.").
Further, the respondents seek a declaration that would mandate a change in educational policy consistent with their policy views. In their amended complaint, they allege that the state's current accountability policy is an obstacle to obtaining a high quality education. Education policy matters such as the state's accountability policies involve thousands of interested persons, including parents, teachers, administrators, and locally elected officials. As in matters of appropriations, under our constitution's strict separation of powers, only the legislature is properly equipped to balance the competing interests involved in education debates, in addition to other vitally important issues such as criminal justice, health care, economic and environmental regulation, and other matters. Thus, it is solely in the legislative branch that the constitutional values of an "efficient, safe, secure and high quality" school system can be constitutionally defined and implemented.
In other words, this question is quintessentially political and thus not justiciable, and the writ of prohibition must issue as the trial court did not have jurisdiction to consider this question. See generally, The Fla. Senate v. Fla. Public Employees Council 79, 784 So.2d 404 (Fla.2001). In Florida Senate, the court recognized that the judiciary has no power to encroach on the legislative process and stated that it is the "final product" of legislation that is subject to judicial review. Id. at 408. Here, however, the respondents seek a declaratory judgment to order the legislature to make policy and appropriation changes in futuro. Thus, while the respondents purport to challenge present appropriations and policies, their prayer for relief seeks to order the legislature to enact policies and increase appropriations, and such relief cannot be granted without interfering in internal legislative affairs, by necessity.
Nor are the respondents' allegations challenging present legislative action enough to immunize improper judicial review from the reach of the writ of prohibition. In State v. Bloom, 497 So.2d 2 (Fla. 1986), the court held that prohibition would lie where a trial court attempted to issue a pre-trial order depriving the elected state attorney from seeking the death penalty. There, the court stated, "If we allowed the circuit judge to make pre-trial determinations of the death penalty's applicability, we would be modifying the death penalty's statutory scheme." Id. at 3. Here, the trial court's order would allow it to conduct a trial of Florida's educational policies and thus act as a legislative body by "modifying" educational policies in direct contravention of article II, section 3.
We can look to several decisions from other states which highlight why this is a non-justiciable case and the dangers of allowing such litigation to consume years and millions of public dollars in a quixotic attempt to somehow craft a judicial remedy for a political challenge. In Marrero v. Commonwealth, 559 Pa. 14, 739 A.2d 110, 111 (1999), the Pennsylvania Supreme Court addressed a state constitutional article that requires the General Assembly to "provide for the maintenance and support of a thorough and efficient system of public education." The plaintiffs sued, claiming that the assembly violated the provision, and presented very similar arguments to the respondents' arguments in the instant case. The trial court dismissed the complaint, finding that it presented a non-justiciable question directed solely to the legislative branch, and judicial *480 review would therefore violate the separation of powers. Id.
On appeal, the court affirmed the trial court's dismissal, holding that the trial court properly ruled that the state constitution did not confer an individual right to a particular level of education, but, instead, imposed a constitutional duty on the legislative branch. Id. at 112. The court noted that the state constitution made it impossible for a court to bind future legislatures "to a present judicial view" of appropriate educational services. Id. The same logic applies in the instant case as the terms "safe, secure, and high quality" are no more quantifiable than the terms "thorough" and "efficient."
The Marrero court further recognized that "[a]s long as the legislative scheme for financing public education `has a reasonable relation' to `[providing] for the maintenance and support of a thorough and efficient system of public schools,' the General Assembly has fulfilled its constitutional duty to the public school students[.]" Id. at 113 (alteration in original) (citations omitted). As did the trial court, the court declined to "inquire into the reason, wisdom, or expediency of the legislative policy with regard to education, nor any matters relating to legislative determinations of school policy or the scope of educational activity." Id.
The Marrero court's recognition that a legislative scheme's "reasonable relation" to a constitutional mandate fulfills a legislature's duty without allowing judicial review rebuts the argument that prohibition cannot lie in the instant case because somehow a litigant or a judge can hypothesize some patently irrational legislative scheme. Prohibition is not defeated because of such a hypothetical, where a multi-billion dollar school system exists based on a complex statutory formula. Clearly, in Florida, there is no credible claim that the legislature has patently abandoned its duty to provide a reasonable education; rather, the respondents' assertion is that somehow the system is not "efficient, secure, and high quality." But such assertions can only be addressed to lawmakers, not judges.
This reality was recognized by the Rhode Island Supreme Court in City of Pawtucket v. Sundlun, 662 A.2d 40 (R.I. 1995). In Sundlun, the court stated
Faced with this absence of standards, the trial justice adopted one: the right to receive an "equal, adequate, and meaningful education," a standard that is not susceptible of judicial management. What constitutes an appropriate education or even an "equal, adequate, and meaningful" one, "is not likely to be divined for all time even by the scholars who now so earnestly debate the issues." Because we believe the proper forum for this deliberation is the General Assembly, not the courtroom, we decline to endorse the trial justice's plan[.]
Id. at 58 (citation omitted). According to the court, the trial court's plan required the people of Rhode Island
"to turn over to a tribunal against which they have little if any recourse, a matter of such grave concern to them and upon which they hold so many strong, though conflicting views. If their legislators pass laws with which they disagree or refuse to act when the people think they should, they can make their dissatisfaction known at the polls. ... The court, however, is not so easy to reach ... nor is it so easy to persuade that its judgment ought to be revised."
Id. (quoting Seattle Sch. Dist. No. 1 of King County v. State, 90 Wash.2d 476, 585 P.2d 71, 120 (1978) (Rosellini, J., dissenting)). The court pointed out one additional caveat: "the absence of justiciable standards could engage the court in a morass *481 comparable to the decades-long struggle of the Supreme Court of New Jersey that has attempted to define what constitutes the `thorough and efficient' education specified in that state's constitution." Id. at 59.
This judicial respect for the separation of powers and the refusal to hear cases which would embroil the courts in a policy morass and isolate the public was also acknowledged by the Illinois Supreme Court in Committee for Educational Rights v. Edgar, 174 Ill.2d 1, 220 Ill.Dec. 166, 672 N.E.2d 1178 (1996). There, the court explained:
To hold that the question of educational quality is subject to judicial determination would largely deprive the members of the general public of a voice in a matter which is close to the hearts of all individuals in Illinois. Judicial determination of the type of education children should receive and how it can best be provided would depend on the opinions of whatever expert witnesses the litigants might call to testify and whatever other evidence they might choose to present. Members of the general public, however, would be obliged to listen in respectful silence.
Id. at 1191. The court held:
We conclude that the question of whether the educational institutions and services in Illinois are "high quality" is outside the sphere of the judicial function. To the extent plaintiffs' claim that the system for financing public schools is unconstitutional rests on perceived deficiencies in the quality of education in public schools, the claim was properly dismissed. For the foregoing reasons, we affirm the dismissal of plaintiffs' claims under the education article of our state constitution.
Id. at 1193. In Lewis E. v. Spagnolo, 186 Ill.2d 198, 238 Ill.Dec. 1, 710 N.E.2d 798, 800 (1999), the court reaffirmed its holding in Edgar that questions relating to the quality of a public school education are for the legislature to decide, not the courts. We must do the same here and grant the writ of prohibition to prevent the trial court from acting without subject-matter jurisdiction.
Accordingly, I believe we should grant the petition. Failing that, I agree with the certified question.

ORDER ON REHEARING
Petitioners' motion for rehearing and clarification filed December 7, 2011, is denied. BENTON, C.J., WOLF, LEWIS, ROBERTS, WETHERELL, ROWE, MARSTILLER, RAY, and SWANSON, JJ., CONCUR. PADOVANO, J., CONCURS in an opinion joined by DAVIS, VAN NORTWICK and CLARK, JJ.
PADOVANO, J., concurring.
I agree with the state that the certified question in the plurality opinion is ineffective to establish a basis for the exercise of discretionary jurisdiction in the Florida Supreme Court. See, Floridians for a Level Playing Field v. Floridians Against Expanded Gambling, 967 So.2d 832 (Fla. 2007). However, I join in the court's decision to deny the state's motion for clarification for two reasons. First, the error identified by the solicitor general  that a majority of the judges of this court did not join in the decision on the issue that was certified  is not one that can be corrected at this point merely by clarifying the opinion. Second, the inadequacy of the certification will make little difference, given the fact that the decision of this court could be reviewed in the Florida Supreme Court on another ground. The supreme court could exercise its discretionary review jurisdiction in this case on the ground that the decision of this court is a decision expressly construing a provision of the Florida *482 Constitution. See Art. V, § 3(b)(3), Fla. Const. (1968); Zingale v. Powell, 885 So.2d 277, 279 n.1 (Fla. 2004); Malicki v. Doe, 814 So.2d 347, 351 n. 1 (Fla. 2002). The en banc decision of this court consists of two separate opinions, but both of them expressly construe the state constitution, albeit for the limited purpose of resolving the jurisdictional issue presented by the petition for writ of prohibition.
I have offered this explanation and potential solution, because the problem is one that was created by the court, not by the parties or their lawyers, and because I believe that the point made in the solicitor general's motion is deserving of a response. My remarks should not be taken as a suggestion that the Florida Supreme Court should accept this case for review. That is a decision for the supreme court.
For these reasons, I vote to deny the motion for clarification. Because I continue to believe that the plurality opinion is correct, I vote to deny the motion for rehearing without further comment.
NOTES
[1] At this juncture, there is no question before us as to whether any particular individual or entitywhether plaintiff or defendant below is a proper party either to the present proceedings or to the proceedings in the trial court.
[2] [I]n civil cases certiorari is rarely granted because the petitioner generally cannot show that any potential injury cannot be rectified on appeal. The caselaw is clear that "[c]ertiorari is not designed to serve as a writ of expediency and should not be granted merely to relieve the petitioners seeking the writ from the expense and inconvenience of a trial." Whiteside v. Johnson, 351 So.2d 759, 760 (Fla. 2d DCA 1977). See also Martin-Johnson, Inc. v. Savage, 509 So.2d 1097 (Fla. 1987) (litigation of a non-issue and inconvenience and expense of same not the type of harm sufficient to permit certiorari review); Continental Equities, Inc. v. Jacksonville Trans. Auth., 558 So.2d 154 (Fla. 1st DCA 1990) (fact that if ruling on damages was incorrect, matter would have to be retried after appeal and at great expense to the parties did not entitle petitioner to writ of certiorari to review the ruling); Kessel Const. Corp. v. Clark-Haney Dev. Team, 487 So.2d 1123 (Fla. 4th DCA 1986) (Glickstein, J., concurring) (cost of trial and appeal is not the kind of damage certiorari is intended to forestall).

Naghtin v. Jones, 680 So.2d 573, 577 (Fla. 1st DCA 1996) (quoting Riano v. Heritage Corp. of South Fla., 665 So.2d 1142, 1145 (Fla. 3d DCA 1996)).
[3] Section 1 of article X of the Illinois Constitution provides, in part: "The State shall provide for an efficient system of high quality public educational institutions and services."
[4] In Coalition for Adequacy and Fairness in School Funding, Inc. v. Chiles, 680 So.2d 400 (Fla. 1996), a group of public school students, their parents and guardians, school boards and their members sued various state officials, including the Governor, the President of the Senate, the Speaker of the House, and the Commissioner of Education, asking the trial court to declare an adequate education a fundamental right under the Florida Constitution that the state had failed to provide by failing to allocate adequate resources for a uniform system of free public schools. The trial court dismissed the complaint with prejudice, on grounds that it presented a nonjusticiable political question, and that the granting of relief would necessarily require the court to usurp or intrude upon the appropriation power reserved to the Legislature. Id. at 402.

The supreme court affirmed, holding that "the legislature has been vested with enormous discretion by the Florida Constitution to determine what provision to make for an adequate and uniform system of free public schools." Id. at 408. Based on this "enormous discretion," the separation of powers doctrine, and the dearth of judicially manageable standards in the text of the education article (before its revision) for determining the "adequacy" of education on a statewide basis, the supreme court upheld the trial court's dismissal of the claims stated in Coalition. Id.
[5] In relevant part, the Commentary to 1998 Amendment reads, as follows:

The addition of "efficient, safe, secure, and high quality" represents an attempt by the 1997-98 Constitution Revision Commission to provide constitutional standards to measure the "adequacy" provision found in the second sentence of section 1. The action of the commission was in direct response to recent court actions seeking a declaration that Article IX, section 1 created a fundamental right to an adequate education, which the state had arguably violated by failing to provide sufficient resources to public education. In Coalition for Adequacy and Fairness in School Funding, Inc. v. Chiles, 680 So.2d 400 (Fla. 1996), the court rejected the notion of a fundamental right to education and found that the issue of "adequacy" was a nonjusticiable, political question. The court found that absent definable standards to provide guidance in determining "adequacy" the court would be usurping the legislature's powers. Subsequently in Advisory Opinion to the Attorney General Re: Requirements for Adequate Public Education Funding, 703 So.2d 446, 449 (Fla. 1997), Justice Anstead, writing in a dissent, noted that the court would have benefited in the earlier Coalition for Adequacy case "if there had been an express statement in the constitution defining `adequate provision' to guide us." In direct response to those rulings, the 1997-98 Constitution Revision Commission added "efficient, safe, secure, and high quality" as standards for determining the "adequacy" of public education. In other states, these same terms have been found to be measurable and meaningful. (See DeRolph v. State, 78 Ohio St.3d 193, 677 N.E.2d 733 (1997) (the court found meaningful standards within the "thorough and efficient standard" established by the Ohio Supreme Court)).
William A. Buzzett and Deborah K. Kearney, Commentary to 1998 Amendment, 26A, Fla. Stat. Ann., Art. IX, § 1, Fla. Const. (2010).
[6] Article XI, section 5 of the Florida Constitution provides that amendments must be approved by the voters.
[7] Other provisions of the Constitution which have been determined to be self-executing are far more definitive and lay out specific procedures for their enforcement. See, e.g. Notami Hosp. of Fla., Inc. v. Bowen, 927 So.2d 139 (Fla. 1st DCA 2006), aff'd, Fla. Hosp. Waterman, Inc. v. Buster, 984 So.2d 478 (Fla.2008); Art. X, § 27, Fla. Const. (containing specific enforceable standards).
[8] While the Legislature has passed a number of statutes dealing with education since the passage of the constitutional amendment addressing article IX, section 1, it is unclear that any of these statutes are comprehensive enough to provide sufficient measurable standards to be considered an implementing statute related to article IX, section 1. This is an issue which should be first addressed in the trial court and which is specifically within the province of the court system to determine. See Advisory Opinion to the Governor-1996 Amendment 5 Everglades, 706 So.2d 278 (Fla. 1997).
[9] Rather than allege that a particular statute is unconstitutional, the respondents allege that the entire statutory array regarding K-12 education, Chapters 100-1013, Florida Statutes, fall short of the constitutional mandate.
[10] The requirement in article IX, section 1(a) at issue can be contrasted with the language in article IX, section 1(a)(1), known as the class size amendment. The class size amendment provides detailed definitions and quantifiable measures. If the drafters of the 1998 amendment to article IX had intended to create judicially manageable standards, it would not have been difficult to do so.